UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

BRIAN A. MAUS,

   Plaintiff,

 v.             Case No. 17-cv-65-pp

MARK LESATZ,
and ROBERT LADE,

   Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 33), DENYING PLAINTIFF'S MOTION TO STRIKE PARTS OF DEFENDANTS' DECLARATIONS (DKT. NO. 59) AND DENYING PLAINTIFF'S MOTION TO AMEND HIS COMPLAINT (DKT. NO. 60)**

---

The plaintiff, who is representing himself, filed this lawsuit under 42 U.S.C. §1983. He alleges that defendant Robert Lade improperly pat-searched him six times between May and August 2011, and that defendant Mark Lesatz turned a blind eye to those improper searches. Dkt. Nos. 9, 13. He also alleges that the defendants retaliated against him after he filed inmate complaints about the improper pat searches. Id. On March 22, 2019, the defendants moved for summary judgment. Dkt. No. 33. The court will deny in part and grant in part the defendants' motion.

I.  **RELEVANT FACTS**

During the time of the events described in the complaint, the plaintiff was an inmate at Green Bay Correctional Institution. Dkt. No. 58 at ¶1.

1

Defendant Robert Lade was a correctional officer who worked in the rotunda, through which inmates pass when traveling between their housing unit and most activities in the institution, including meals, doctor appointments and school. Id. at ¶ 2. Defendant Mark Lesatz was a captain at Green Bay. Id. at ¶3.

As a rotunda officer, Lade conducted pat searches on inmates passing through the rotunda as a way of detecting contraband that inmates may be concealing and transporting.[1] Id. at ¶12. Contraband includes stolen property, weapons and drugs and poses a threat to institution staff and to inmates. Dkt. No. 35 at ¶¶5-6. (The plaintiff asserts that not all contraband poses a risk, and that he has never been caught in possession of weapons or drugs. Dkt. No. 48 at ¶6.) The defendants explain that inmate searches are critical to the security of the institution—they allow staff to identify and confiscate contraband, and to identify evidence of assault or injury to inmates. Dkt. No. 35 at ¶4. The defendants say that the security director at Green Bay expects each correctional officer to conduct a minimum of six pat searches per shift. Id. at ¶10. The inmate handbook informs inmates that "[p]ersonal (pat-down) searches may be made of any inmate at any time, in any location." Id. at ¶11.

---

[1] The defendants—Lade, particularly—say that passing through the rotunda is "when and where contraband that inmates are looking to pass could be concealed and transported." Dkt. No. 35 at ¶12. The plaintiff says inmates could conceal and transport contraband anywhere, any time. Dkt. No. 58 at ¶12.

A. Pat Search Policies at Green Bay

According to the defendants, if a group of fewer than ten inmates was passing through the rotunda, all inmates in the group were searched.[2] Id. at ¶13. The defendants say that during mass movements (such as at mealtime, school and recreation), officers in the rotunda would pick a number between seven and fifteen, and inmates would be selected for pat searches at that interval. Id. at ¶14. For example, if officers picked seven, every seventh inmate would be pat searched. Id. Officers also would pat search inmates who figured out the search pattern and appeared to be evading a pat search by changing their position in line. Id. at ¶15. Finally, officers searched all kitchen workers going to and from work to stop them from passing items during meals or stealing items from the kitchen. Id. at ¶16.

During rotunda searches, at least two officers are present, which allows for more efficient searches of a large number of inmates; a supervisor also is present to act as a witness for both the inmate and the officer conducting the search. Id. at ¶18. Each time a pat search is performed, it is recorded on the Green Bay Pat Search Report. Id. at ¶19. The report generally includes the date and time of the search, the inmate's name and number, whether the metal detector was used, whether the officer found contraband, and the initials of the officers present during the search (it does not necessarily indicate which officer performed the search). Id. at ¶¶19, 21.

---

[2] The plaintiff asserts that he has seen anywhere from one to fifty inmates stopped at a time and searched. Dkt. No. 58 at ¶13.

3

There are a few exceptions regarding the information recorded about each search. For example, a group of workers going to the kitchen would be listed as "kitchen" with the number of inmates searched, rather than each inmate's name and inmate number. Id. at ¶19. The report does not explain *why* an inmate was searched—it could be because he was part of a group of fewer than ten, because he was randomly selected during mass movement or because he appeared to be evading search during mass movement. Id. at ¶20.

To perform a pat search, the trained officer first speaks to an inmate and checks his mouth. Id. at ¶22. The officer then performs the rest of the pat search from behind the inmate. Id. The officer directs the inmate to stand with his arms extended, fingers separated and feet twelve to eighteen inches apart. Id. The officer visually assesses the inmate's hair and ears. Id. at ¶23. Then, with both hands, the officer checks the collar of a collared shirt or the top of the shoulders. Id. With palms down, the officer moves across the top of the extended arms to the end of the clothing. Id. Then, with the backs of his hands, the officer searches the underside of the arms from the end of the clothing to the armpits. Id. With palms facing the inmate's body, the officer searches down the inmate's sides to the beltline. Id.

The officer next checks the inmate's chest with the thumb/wrist area of a bladed hand. Id. at ¶24. A bladed hand is used so the officer is unable to grab or touch the inmate inappropriately while looking for contraband. Id. The officer then checks the inmate's back with the back of his hands (fingertips pointing toward each other), from the shoulders to the waistline. Id.

The officer then tells the inmate he will check his waistband. Id. at ¶25. To do that, the officer (who is still behind the inmate) runs the waistband between his thumb and forefinger from the front to the back, pulling the waistband slightly away from the inmate's body so that the officer is not touching the inmate and so that any contraband can fall out of the waistband. Id.

The search then proceeds to the inmate's legs. Id. at ¶26. Depending on what the inmate is wearing, the officer either pats or slides his hands down each leg using both hands at the same time, beginning well up in the groin, continuing down to the ankle and finishing by checking the cuffs and socks. Id. at ¶26. While checking the legs, the officer touches the inmate only with his thumb and forefinger, with his palms facing down. Id. According to the defendants, any contact with the groin area is incidental to the search and is done to make sure there is no concealed contraband. Id. at ¶27. The defendants assert that a proper pat search takes less than a minute. Id. at ¶29.

B.  Lade's Pat Searches of the Plaintiff

The defendants state that the plaintiff passed through the rotunda "several times a day every day and he was only searched seven times in three months." Id. at ¶36. They allege, and the plaintiff does not dispute, that between January 1, 2011 and June 30, 2012, the plaintiff was singled out for pat searches in the rotunda nineteen times; they say that Lade was present for, or conducted, the searches nine of those nineteen times. Id. at ¶31. Lade asserts that the searches he performed were done pursuant to policy and for

5

the security of the institution; he states that the searches were not performed to harass the plaintiff. Dkt. No. 35 at ¶¶39, 42, 43, 58, 66, 74, 78, 81.

The plaintiff asserts that Lade "grabbed, touched and felt all on the plaintiff's pen[is], groin and nuts" during six of those searches: on May 27, May 28, May 29, June 14, August 2 and August 25, 2011.[3] Id. at ¶32; Dkt. No. 64 at ¶¶5, 7, 9, 11, 13, 14. The plaintiff states that "[a]ll the time [he] has been imprisoned and have went [sic] through hundreds of pat searches [he has] never had a staff member go deep into [his] groin area or grab, feel or touch on [his] pen[is], groin or nuts." Dkt. No. 64 at ¶19. Contact with the plaintiff's groin was over his clothes and lasted four to seven seconds. Dkt. No. 58 at ¶33. Lade did not say anything inappropriate to the plaintiff during the searches. Id. at ¶34.

Lesatz was not present for Lade's searches of the plaintiff on May 29, June 14, July 27, August 2 or August 25. Dkt. Nos. 35, 58 at ¶¶48, 59 and 71. The only pat search performed by Lade of the plaintiff for which Lesatz was present was the search on May 28, 2011. Dkt. No. 35 at ¶44. Lesatz asserts that he did not actually witness the pat search. Dkt. No. 35 at ¶45. He states

---

[3] In his complaint, the plaintiff alleged that the two August searches occurred on August 12 and 20. The plaintiff explains that was an error; the correct dates are August 2 and 25. Dkt. No. 58 at ¶32. The plaintiff filed a motion to amend his amended complaint to reflect the correct dates. Dkt. No. 60. The court will deny that motion as unnecessary. The purpose of a complaint is to put the defendants on notice of the claims against them. Development of the record has revealed that some of the details in the plaintiff's complaint were inaccurate, but because those details were not material to the court's determination that the plaintiff stated a claim and because the defendants address the searches on these dates in their motion, it is unnecessary for the plaintiff to amend his amended complaint to correct the dates.

6

that after Lade completed his search, the plaintiff turned around and told Lesatz that the searches were "a game of harassment." Id. at ¶44. Lesatz says he told the plaintiff that he had the right to file an inmate complaint if he believed his rights were being violated. Id.

The plaintiff remembers this interaction differently. He asserts that he told Lesatz that Lade had "just grabbed, felt and touched on [his] pen[is], groin and nuts." Dkt. No. 58 at ¶44. According to the plaintiff, Lesatz "made the smart remark to [the plaintiff] that he shouldn't of came [sic] to prison." Id. The plaintiff asserts that the plaintiff told Lesatz that he was going to file a lawsuit if Lade kept sexually assaulting him during pat searches. Id. at ¶53. The plaintiff says that Lesatz told him "that he [would] make sure the plaintiff is pat searched every time he comes out of his cell." Dkt. No. 64 at ¶8.

### C. The Plaintiff's Complaints about the Pat Searches

On May 31, 2011, the plaintiff filed an inmate complaint about the pat searches performed on May 27, 28 and 29, 2011. Dkt. No. 35 at ¶49; Dkt. No. 39-3 at 10-12. The plaintiff did not describe any inappropriate touching or sexual conduct by Lade (or any other officer). Dkt. No. 35 at ¶50. The defendants assert that the plaintiff stated that pat searches were illegal and done to harass the plaintiff "for writing to Scott Walker." Id. In fact, the complaint itself shows that the plaintiff stated that there was a conspiracy to harass him, and he threatened to file a lawsuit and write to Scott Walker, not that he claimed the harassment was because he'd written to Scott Walker. Dkt. No. 39-3 at 12. The complaint also alleged that in response to the plaintiff

7

telling Lesatz the plaintiff would be filing a lawsuit, Lesatz told the plaintiff that he'd make sure the plaintiff was pat searched every night. Id. at ¶54.

Lade was not mentioned in the inmate complaint, and he asserts that no one contacted him about the complaint. Id. at ¶51. The inmate complaint examiner, however, contacted Lesatz as part of the investigation into the complaint's allegations. Id. at ¶52. Lesatz asserts that he described the exchange between him and the plaintiff, reporting that the plaintiff complained about being pat searched and stated that he might file a lawsuit. Id. at ¶53. Lesatz said he told the plaintiff that the plaintiff could file a lawsuit but it wouldn't stop them from searching inmates for security reasons. Id. at ¶53. Lade asserts that he never directed or instructed any officer to single out the plaintiff for pat searches, and that the pat search report reflects that the plaintiff was only periodically singled out for a pat search. Id. at ¶55. See also Dkt. No. 37-2 (rotunda pat search report).

The plaintiff filed a second inmate complaint about the pat search Lade performed on June 14, 2011. Id. at ¶60; Dkt. No. 39-4. The defendants assert that in this second complaint, the plaintiff claimed that Lade had illegally pat searched him to harass him for writing to Scott Walker about the misconduct at the institution. Dkt. No. 35 at ¶ 60. The plaintiff also alleged that he believed this was sexual misconduct. Id. Lade and Lesatz state that neither of them was contacted about this inmate complaint. Id. at ¶61.

The plaintiff filed a third inmate complaint on August 3, 2011, alleging that Lade had inappropriately touched him during searches on July 27 and

8

August 2, 2011. Id. at ¶67; Dkt. No. 39-5 at 12. The complaint triggered a Prison Rape Elimination Act (PREA) investigation. Dkt. No. 35 at ¶68. On August 8, 2011, investigators interviewed Lade as part of their investigation. Id. Lade asserts that this was the first time he learned that the plaintiff had filed an inmate complaint about him. Id. at ¶69. Lesatz was not contacted about this inmate complaint or interviewed as part of the PREA investigation. Id. at ¶72.

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

9

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. The Court's Analysis

As a preliminary matter, the court will deny the plaintiff's motion to strike parts of the defendants' declarations. Dkt. No. 59. The plaintiff disagrees with some of the assertions in the declarations. Id. He has a right to disagree, but that is not a basis for the court to strike the declarations. Instead, a party who doesn't agree with assertions in a declaration may present his own evidence to contradict or disprove the assertions. The court will treat the plaintiff's motion as a response to the defendants' declarations.

To prevail on a claim that a pat search violated the Eighth Amendment, a plaintiff must show that the search was "maliciously motivated, unrelated to institutional security, and hence totally without penological justification." Whitman v. Nesic, 368 F.3d 931, 934 (7th Cir. 2004) (internal quotation marks and citations omitted). "In other words, the search must amount to calculated harassment unrelated to prison needs, with the intent to humiliate and inflict psychological pain." Id. (internal quotation marks and citations omitted).

Lade asserts that his pat searches of the plaintiff were consistent with the institution's policy and training. He explains that, during the search of an

inmate's leg, he would touch the inmate only with his thumb and finger, palms facing down, meaning any contact with an inmate's groin would be with the backs of his hands. While a pat search of the leg begins in the groin area, Lade asserts that any contact with the groin is merely incidental.

This isn't consistent with how the plaintiff describes the six searches about which he complains. The plaintiff says that he has been pat searched hundreds of times during his incarceration and that these six pat searches were different than others he has experienced. He asserts that Lade grabbed or felt his genitals, implying contact was not limited to the backs of Lade's hands. He also states that Lade's contact with his genitals lasted four to seven seconds, which a jury could reasonably conclude is more than "incidental" contact.

The plaintiff argues, and the court agrees, that it is not relevant that the touching occurred over the plaintiff's clothes, or that Lade did not make any inappropriate comments. If ensuring institutional security did not require Lade to "grab, touch and [feel] all on the plaintiff's pen[is], groin and nuts" (and Lade does not assert that it did), a jury who believed the plaintiff's description of the pat searches could reasonably conclude that Lade performed the searches with the intent to humiliate or inflict psychological pain on the plaintiff. Given the parties' dispute over the extent and nature of Lade's pat searches of the plaintiff, Lade is not entitled to summary judgment on this claim.

Nor is Lade entitled to qualified immunity. The defendants argue that the plaintiff had to show that it was "beyond debate" to someone in Lade's position

that he would violate the plaintiff's rights "by conducting pat searches on him, pursuant to policy." Dkt. No. 34 at 25. They argue that the plaintiff can't make such a showing. But Lade's argument mischaracterizes the plaintiff's claim. The plaintiff's claim is premised on his assertions that Lade did *not* pat search him pursuant to policy and that Lade sexually assaulted him by grabbing and touching his genitals while pat searching him. As discussed above, the plaintiff's right to be free from the misconduct he describes has long been clearly established. See Dist. of Columbia v. Wesby, 138 S.Ct. 577, 589 (2018) (explaining that officers are not entitled to qualified immunity if the unlawfulness of their conduct was clearly established at the time).

Lesatz, however, is entitled to summary judgment on the plaintiff's claim that he did not stop Lade from improperly pat searching the plaintiff. The only time a supervisor will be held liable for a subordinate's misconduct is if the supervisor directs or consents to the misconduct. For example, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye" for fear of what they might see. Id. (quoting Jones v. City of Chi., 856 F.2d 985, 992 (7th Cir.1988)). "[S]upervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable." Jones, 856 F.2d at 992.

The parties agree that Lesatz was present during only one of the six problematic pat searches. During that pat search, Lade was standing between Lesatz and the plaintiff, and the plaintiff was facing away from both defendants. Lesatz asserts that he did not actually see Lade pat search the

12

plaintiff. The plaintiff has offered no evidence to rebut this assertion. Because the plaintiff had his back to Lade and Lesatz, he has no first-hand knowledge about what Lesatz was looking at during the pat search. The fact that Lesatz was present in the rotunda to observe pat searches does not prove that he closely watched every aspect of every pat search that an officer performed. Because Lesatz did not watch Lade search the plaintiff, he could not have known that Lade was allegedly touching the plaintiff's groin in an improper manner. And the plaintiff concedes that he didn't tell Lesatz that Lade had improperly pat searched him until *after* Lade was done with the search. Lesatz cannot be liable for failing to stop misconduct he did not know about until after the misconduct happened.

As to the other five searches, the plaintiff offers no evidence from which a jury could conclude that Lesatz knew Lade was continuing to improperly pat search the plaintiff. An inmate complaint examiner contacted Lesatz about the plaintiff's May 31, 2011 inmate complaint, but the plaintiff did not make allegations of sexual harassment in that complaint. He complained only about Lesatz's alleged threat to search the plaintiff every time he left his cell. The plaintiff does not assert that after that initial search he ever talked to Lesatz about Lade improperly searching him. There is no evidence to support a conclusion that Lesatz knew that Lade's alleged misconduct was a continuing problem rather than a one-time event. Again, Lesatz cannot be liable for failing to address misconduct that he did not know about. He is entitled to summary judgment on this claim.

Finally, the defendants are entitled to summary judgment on the plaintiff's retaliation claim. "To prevail on his First Amendment retaliation claim, [the plaintiff] must show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the [d]efendants' decision to take the retaliatory action." Gomez v. Randle, 680 F.3d 859, 866 (7th Cir. 2012) (internal quotation marks and citations omitted). The court finds that the plaintiff's statements that Lade improperly pat searched him are sufficient for a jury to conclude that he suffered a deprivation that would likely deter First Amendment activity in the future.[4] Accordingly, the court's analysis will focus on prongs one and three of the standard.

The plaintiff asserts that he engaged in activity protected by the First Amendment when he told Lade on May 27, 2011, and Lade and Lesatz on May 28, 2011, that he was going to file an inmate complaint about the searches. Dkt. No. 64 at ¶¶6, 7. The Seventh Circuit has stated that "it seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance." Bridges v. Gilbert, 557 F.3d 541, 554 (7th Cir. 2009) (emphasis in original); see Jackson v. Dix, No. 16-cv-1394-pp, 2018 WL 1370260 at *6 (E.D. Wis. Mar. 16, 2018) (acknowledging that, "[a]t this

---

[4] The defendants argue that being pat searched, even excessively, is not a deprivation that would deter First Amendment activity, but the plaintiff does not assert only that he was pat searched; the plaintiff asserts that Lade sexually assaulted him during pat searches.

14

point, the Seventh Circuit has not specifically found that threatening to file a grievance is activity protected by the First Amendment.") While it is well settled that *filing* an inmate complaint is protected activity, the plaintiff did not actually file an inmate complaint about the pat searches until May 31, 2011. Dkt. No. 58 at ¶49.

As to Lesatz, the plaintiff asserts that Lesatz and Lade agreed that Lade would improperly search the plaintiff on May 28 because the plaintiff had told Lade the day before that he was going to file an inmate complaint. Lesatz denies this; he asserts that he never instructed anyone to target the plaintiff for a pat search. Dkt. No. 36 at ¶16. The plaintiff points to a PREA investigation summary to dispute Lesatz's assertion. In the summary, the investigator states, "Lesatz told Lade to pat search [the plaintiff] whenever he comes through the Rotunda, because in prison pat searches are done on a regular basis." Dkt. No. 39-2 at 4. It appears the plaintiff may misunderstand this statement. The investigator appears to be paraphrasing the *plaintiff's assertions* about what he says Lesatz told Lade rather than paraphrasing what Lade said Lesatz told him. In any event, the investigator's notes about what Lesatz said are hearsay, and therefore, are insufficient to overcome a motion for summary judgment. See Gunville v. Walker, 583 F.3d 979, 985 (7th Cir. 2009).

Lesatz says he learned of the plaintiff's complaints about Lade's search after Lade was done searching the plaintiff, when the plaintiff told Lesatz and threatened to file an inmate complaint. The parties agree that Lesatz was not

15

present for any of the allegedly improper searches after May 28, and the plaintiff has provided no admissible evidence to rebut Lesatz's assertion that he never directed anyone to target the plaintiff for pat searches. Further, and more to the point, the plaintiff has offered no evidence to support a conclusion that officers targeted the plaintiff as he says Lesatz threatened. The plaintiff passed through the rotunda several times per day, yet over the course of months, officers searched him only a handful of times. Accordingly, no jury could reasonably conclude from the evidence that Lesatz had any involvement in directing Lade or any other officer to search the plaintiff in retaliation for filing inmate complaints. While the plaintiff's allegation that Lesatz directed Lade to search the plaintiff was sufficient to state a claim at the screening stage, mere allegations are not sufficient to survive summary judgment. The plaintiff must produce evidence to create a question of fact about whether Lesatz was personally involved in the searches, and he hasn't presented any. Lesatz is entitled to summary judgment on this claim.

As to Lade, no jury could reasonably conclude that the plaintiff's threats to file an inmate complaint were what motivated Lade to continue improperly pat searching the plaintiff. The plaintiff concedes that the first improper pat search occurred before the plaintiff made any reference to filing an inmate complaint. And, after the plaintiff told Lade that he was going to file an inmate complaint, the plaintiff says Lade responded that "he doesn't give a fuck" and that the improper searches weren't going to stop. Dkt. No. 64 at ¶9; Dkt. No. 57 at 3; Dkt. No. 9 at ¶3. The plaintiff's own evidence shows that Lade began the

16

improper searches before the plaintiff threatened to file an inmate complaint and that he was not affected by the plaintiff's threat to file the complaint.

The only reasonable conclusion a jury could draw is that Lade persisted in improperly pat searching the plaintiff *in spite of* the plaintiff's threats to file an inmate complaint, not *because of* the plaintiff's threats to file an inmate complaint. Because the plaintiff has presented no evidence from which a jury could conclude that the plaintiff's threat to file an inmate complaint was the reason why Lade continued to improperly search the plaintiff, Lade is entitled to summary judgment on the plaintiff's retaliation claim.[5] See Nieves v. Bartlett, ___ U.S. ___, 139 S. Ct. 1715, 1722 (2019) ("It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a but-for cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.")

### III. CONCLUSION

The court **GRANTS** the defendants' motion for summary judgment as to Lesatz on the plaintiff's First and Eighth Amendment claims. Dkt. No. 33.

The court **ORDERS** that defendant Lesatz is **DISMISSED**.

---

[5] As noted, the Seventh Circuit has not determined whether threatening to file an inmate complaint is activity protected by the First Amendment. In reaching its decision that the defendants are entitled to summary judgment, the court means only to acknowledge that, even if threats to file an inmate complaint are protected activity, the plaintiff's retaliation claim fails. The court is *not* deciding that threatening to file an inmate complaint is protected activity.

The court **GRANTS** the defendants' motion for summary judgment as to Lade on the plaintiff's First Amendment claim. Dkt. No. 33.

The court **DENIES** the defendant's motion for summary judgment as to the plaintiff's Eighth Amendment claim against Lade. Dkt. No. 33.

The court **DENIES** the plaintiff's motion to strike parts of the defendants' declarations. Dkt. No. 59.

The court **DENIES** as unnecessary the plaintiff's motion to amend his complaint. Dkt. No. 60.

The court will attempt to recruit a lawyer to represent the plaintiff on his surviving claim against Lade. The plaintiff need do nothing more at this time. The court will notify the plaintiff once it finds a volunteer lawyer willing to represent him.

Dated in Milwaukee, Wisconsin this 10th day of March, 2020.

        **BY THE COURT:**

        _____
        **HON. PAMELA PEPPER**
        **Chief United States District Judge**